NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE MAGNESIUM OXIDE ANTITRUST LITIGATION | Civ. No. 10-5943 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

TRUJILLO, RODRIGUEZ & RICHARDS, LLC
by: Lisa J. Rodriguez, Esq.
258 Kings Highway East
Haddonfield, NJ 08033

GOLD BENNETT CERA & SIDENER LLP
by: Solomon B. Cera, Esq.
     C. Andrew Dirksen, Esq.
595 Market Street, Suite 2300
San Francisco, CA 94105

GOLDMAN SCARLATO & KARON, P.C.
by: Daniel R. Karon, Esq.
700 W. St. Clair Avenue, Suite 204
Cleveland, OH 44113

   *Attorneys for Direct Purchaser Plaintiffs,*

LITE DEPALMA GREENBERG, LLC
by: Allyn Z. Lite, Esq.
    Joseph J. DePalma, Esq.
Two Gateway Center
12th Floor
Newark, NJ 07102

HAGENS BERMAN SOBOL SHAPIRO LLP
by: Steve W. Berman, Esq.
    Anthony D. Shapiro, Esq.
    Elizabeth A. Fegan, Esq.
    Jason A. Zweig, Esq.

One Penn Plaza, 36th Floor
New York, NY 10110

HUDSON MALLANEY & SHINDLER
by: J. Barton Goplerud, Esq.
5015 Grand Ridge Dr.
Suite 100
West Des Moines, IA 50265

GIRARDI KEESE
by: Stephen G. Larson, Esq.
1126 Wilshire Boulevard
Los Angeles, CA 90017

   *Attorneys for Indirect Purchaser Plaintiffs,*

LOWENSTEIN SANDLER PC
by: Douglas S. Eakley, Esq.
    Michael J. Hahn, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
by: Aidan Synnott, Esq.
     Daniel A. Crane, Esq.
1285 Avenue of the Americas
New York, NY 10019

COZEN O'CONNOR, P.C.
by: John P. Johnson, Esq.
    Francis P. Newell, Esq.
    Peter M. Ryan, Esq.
1900 Market Street
Philadelphia, PA 10103

FINKLESTEIN THOMPSON LLP
by: Rosalee B. Connell, Esq.
    Douglas G. Thompson, Esq.
    Michael G. McLellan, Esq.
1050 30th Street, NW
Washington, DC 20007

   *Attorneys for Defendants.*

**DEBEVOISE, Senior District Judge**

This matter arises out of two Second Amended Consolidated Class Action Complaints filed by Direct Purchaser Plaintiffs ("DP Plaintiffs") Orangeburg Milling Company, Inc., Bar Ale, Inc., and Air Krete, Inc. (the "DP SAC") and Indirect Purchaser Plaintiffs ("IP Plaintiffs") Ronald Hayek, Daniel, Walker, Sue Walker, and John Bidart (the "IP SAC"), respectively, against Defendants Premier Chemicals, LLC ("Premier"), Sumitomo Corporation of America ("Sumitomo"), and YAS, Inc. ("YAS"), alleging a conspiracy to fix prices in and allocate shares of the domestic Magnesium Oxide ("MgO") market from January 2002 to the present ("the Class Period") that resulted in DP Plaintiffs' paying artificially inflated prices for MgO and IP Plaintiffs' paying such prices for products containing MgO.  This case concerns the two most common forms of MgO: Caustic-calcined magnesia ("CCM") and dead-burned magnesia ("DBM").  DBM and CCM are produced differently and have different commercial applications.

On December 22, 2011, Defendants moved to dismiss both the DP SAC and IP SAC. For the reasons set forth below, Defendants' motion is GRANTED with respect to the IP SAC and DENIED with respect to the DP SAC.

## I. BACKGROUND

The facts of this case are fully set forth in In re Magnesium Oxide Antitrust Litig., Civ. No. 10-5943, 2011 WL 5008090 (Oct. 20, 2011).  Thus, for the sake of brevity, the Court will repeat only those facts that are necessary to the disposition of Defendants' current motion.

On November 15, 2010, DP Plaintiffs filed a Class Action Complaint ("CAC") against Defendants pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and seeking class certification under Federal Rule of Civil Procedure 23(b)(2) and (3), declaratory judgment, treble damages, costs

and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

On October 7, 2010, IP Plaintiffs filed a CAC against Defendants under Section 16 of the Clayton Act, alleging violations of Section 1 of the Sherman Act, and under various state antitrust and consumer protection laws. IP Plaintiffs seek similar relief as DP Plaintiffs.[1] On December 31, 2010, IP Plaintiffs filed an Amended CAC to add factual allegations similar to those added by DP Plaintiffs in their Amended CAC.

On March 1, 2011, Defendants filed a Motion to Dismiss all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). On October 20, 2011, the Court granted Defendants' motion. Although the Court found that Plaintiffs successfully alleged a meeting of the minds among all Defendants to fix prices in and allocate shares of the domestic MgO market (to meet the pleading standards for an antitrust conspiracy), it held that (1) IP Plaintiffs failed to establish standing to pursue their antitrust claims because they failed to specify which products they purchased that contained MgO[2]; and (2) Plaintiffs' federal antitrust claims were time-barred under the applicable four-year statute of limitations, and Plaintiffs failed to adequately plead the elements of fraudulent concealment under Federal Rule of Civil Procedure 9(b) to equitably toll the statute of limitations.[3]

---

[1] To be sure, IP Plaintiffs seek only injunctive relief for Defendants' alleged violations of federal antitrust laws, as only direct purchasers may bring federal antitrust actions for damages. Illinois Brick v. Illinois, 431 U.S. 720 (1977).

[2] The Court further found that IP Plaintiffs lacked standing to pursue the majority of their state antitrust, consumer protection, and unfair competition claims. In addition, the Court dismissed those consumer protection claims under which IP Plaintiffs maintained standing to the extent they were based on allegations of fraud because those allegations did not comply with the requirements of Federal Rule of Civil Procedure 9(b)

[3] The Court also dismissed IP Plaintiffs' state antitrust, consumer protection, and unfair competition claims as time-barred under their respective statutes of limitations.

In doing so, the Court found that "Plaintiffs fail to allege particular circumstances surrounding the MgO market indicating that the alleged conspiracy was self-concealing. Plaintiffs come close to pleading an affirmative act of concealment in alleging that 'price increases for MgO were justified by references to tight supply, thinning margins, and increased energy and freight costs' . . . however they fail to explain the particular circumstances surrounding Defendants' price increases and pretextual justifications for those increases— information which is in Plaintiffs' control—in accordance with Rule 9(b)." In re Magnesium Oxide, 2011 WL 5008090, at *22.  However, the Court granted Plaintiffs leave "to adequately plead either (1) circumstances surrounding the MgO market during the Class Period indicating that the alleged conspiracy is self-concealing, or (2) particular circumstances surrounding Defendants' price increases and the allegedly pretextual justifications for those price increases." Id.

The Court also found that "Plaintiffs make no allegations that they were misled by Defendants' concealment of the alleged conspiracy and therefore have failed to meet the second element of fraudulent concealment . . . [but granted] Plaintiffs leave to amend to adequately plead that they relied on the self-concealing nature of Defendants' conspiracy and/or pretextual justifications for Defendants' price increases." Id. at *23.

The Court found Plaintiffs' allegation that, due to the secretive nature of the alleged MgO conspiracy, "neither plaintiffs nor the class members had knowledge of any of the foregoing violations, and neither plaintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations" did not satisfy the due diligence element of fraudulent concealment because "it fail[ed] to encompass when and how Plaintiffs ultimately discovered the alleged

5

MgO conspiracy—information that is certainly with Plaintiffs' control," and [w]ithout some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period." Id. at *25. Thus, the Court granted Plaintiffs leave to amend "to adequately plead, in accordance with Rule 9(b), (1) when and how they discovered the alleged MgO conspiracy, and (2) that the self-concealing nature of the conspiracy and/or pretextual justifications for Defendants' price increases made it so that they were not alerted to any storm warnings that would otherwise trigger an obligation to perform due diligence." Id.

Finally, the Court granted IP Plaintiffs leave to amend "in order to allege (1) the specific purchased products containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets." In re Magnesium Oxide, 2011 WL 5008090, at *7.

On November 21, 2011, DP Plaintiffs filed a SAC adding facts to bolster their allegations of fraudulent concealment. DP Plaintiffs allege that "the earliest [they] were put on inquiry notice by counsel was in late 2007," and that "[a] diligent investigation ultimately led to the commencement of the actions in 2010." (DP SAC ¶ 49.) Specifically, DP Plaintiffs began investigating [D]efendants' conduct . . . and the MgO industry . . . after a witness (who was not a purchaser of MgO) informed attorneys of the details" of a meeting—discussed at length in the Court's prior Opinion—that took place among several parties, in a hotel, in Tulsa, Oklahoma, at which the conspiracy was revealed (the "Tulsa Meeting").[4] (DP SAC ¶ 54.) Throughout the Class Period, however, "[t]he justifications offered by [D]efendants for their price increases were false, pretextual, and/or misleading and operated to conceal the conspiracy" from DP Plaintiffs.

---

[4] At oral argument, DP Plaintiffs' counsel stated that the whistleblower informed of the events of the Tulsa Meeting shortly thereafter.

6

(DP SAC ¶ 50.)  In addition, "[t]here were no events during the Class Period sufficient to put either [P]laintiffs or class members on inquiry notice to diligently investigate a potential antitrust claim."  (DP SAC ¶ 54.)

DP Plaintiffs allege that,"[d]uring the Class Period, price increases for MgO were not out of the norm in the industry and were often justified by references to tight supply, thinning margins, and increased energy and freight costs."  (DP SAC ¶ 51.)  To be sure, "[D]efendants' price increase announcements during the Class Period sometimes did not contain justifications for price increases."  (DP SAC ¶ 52.)  For example, Premier publicly announced a four percent price increase on its entire MgO product line, effective January 1, 2004, without providing a justification.  In addition, "[D]efendants' price increase justifications were typically given to customers orally rather than in writing."  (Id.)

DP Plaintiffs set forth four examples during the Class Period where Premier provided specific pretextual reasons for MgO price increases: (1) a March 24, 2003 article in the *Chemical Reporter* stating that Premier "was prompted to raise pricing and enact an energy surcharge on magnesium oxide, effective March 1, citing 'thinning margins and the spike in natural gas costs'" (id.); (2) a March 15, 2004 article stating that Tom Miller, an Executive Vice President at Premier, said that, "despite improved pricing, margins remain squeezed by rising production costs," and that "[f]urther price increases are likely unless market conditions for raw materials and energy change" (id.); (3) a "late 2007" price increase announcement of 4%-12% by Premier, effective January 1, 2007, for all of its MgO grades for which it cited "the rising cost of raw materials, energy, and freight" (id.); and (4) an April 24, 2008 price increase announcement by Premier, effective June 1, 2008, on certain grades of MgO that was allegedly "based on higher energy and labor costs" (id.).  DP Plaintiffs further allege that Sumitomo and YAS "also justified

7

price increases to customers at times during the Class Period for reasons identical or similar to those stated by [] Premier." (Id.)  While "Defendants' statements justifying their MgO price increases throughout the Class Period appeared to be legitimate and based on competitive market forces, [] they were nevertheless false and misleading, and constituted affirmative and overt acts of concealment of the conspiracy." (Id.)

As a result, DP Plaintiffs allege, "Defendants' customers, including [P]laintiffs and class members, were [] conditioned by experience in dealing with [D]efendants in what they believed to be a competitive industry to expect price increases from time to time," and thereby "lulled into believing that MgO price increases were the normal result of competitive market forces rather than the product of collusive and unlawful efforts." (DP SAC ¶ 53.)  Further, according to DP Plaintiffs, "Defendants purposefully concealed their conspiracy because, given competition in the industry and tight margins, plaintiffs and the class members would not have tolerated an openly collusive price increase or any anticompetitive conduct on the part of [D]efendants." (Id.)

IP Plaintiffs also filed a SAC, on November 21, 2011, setting forth additional allegations of fraudulent concealment.  In doing so, IP Plaintiffs cite to several articles and websites in the public domain that note specific MgO price increases announced by Premier, along with similar justifications as those noted by DP Plaintiffs.

In contrast to DP Plaintiffs, IP Plaintiffs were not on inquiry notice until DP Plaintiff Orangeburg Milling Company, Inc. filed a Complaint, on September 1, 2010, in the Eastern District of Pennsylvania alleging antitrust violations by Defendants.  See Orangeburg Milling Co., Inc. v. Premier Chemicals, LLC, No. 2:10-cv-04450.  This is because IP Plaintiffs are farmers "with no ties to any of the Defendants through which they could have obtained internal

8

information related to this matter." (IP SAC ¶ 60.) Therefore, they "could only have learned about [the MgO] conspiracy had there been any news or public disclosure about the conspiracy." (Id.) There was no such disclosure. Shortly after Orangeburg Milling filed the aforementioned complaint, however, IP Plaintiffs investigated the allegations contained therein and filed their own respective lawsuits.

The IP SAC also alleges that IP Plaintiffs purchased specific types of cattle feed and mineral packs containing up to 4% CCM. IP Plaintiffs maintain that the specific percentage of CCM in these products is important to maintaining the health of their cows.

## II. DISCUSSION

Defendants now move to dismiss both the DP and IP SACs pursuant to Federal Rule of Civil Procedure 12(b)(6). In doing so, they argue that (1) both DP and IP Plaintiffs fail to plead the elements of fraudulent concealment with particularity as required by Federal Rule of Civil Procedure 9(b); and (2) IP Plaintiffs lack standing to pursue their antitrust claims because they fail to allege a nexus between the alleged MgO conspiracy and their injuries.

**A.    Standard of Review**

In assessing the parties' arguments, the Court must apply the standard of review applicable to requests for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). That rule permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The Court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be

afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007). The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, Bell Atlantic, 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged." Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949. Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying

pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

When a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), leave to amend and reassert that claim is ordinarily granted. In re Burlington Coat Factory Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). A claim may be dismissed with prejudice, however, if amending the complaint would be futile. Id. "Futile," as used in this context, means that the complaint could not be amended to state a legally-cognizable claim. Id. (citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).

### B.     Plaintiffs' Allegations of Fraudulent Concealment

The equitable doctrine of fraudulent concealment applies to every federal statute of limitations. Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946). To toll a statute of limitations through fraudulent concealment, a plaintiff must show "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action." In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1178-79 (3d Cir. 1993) (citation omitted). In addition, allegations of fraudulent concealment must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b). In re Mercedes-Benz Anti-Trust Litig., 157 F. Supp. 2d 355, 368 (D.N.J. 2001).

However, "Rule 9[(b)] does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control." Id. (citing In re Craftmatic Secs. Litig., 890 F.2d 628, 645 (3d Cir. 1989)). Indeed, "[c]ourts must be sensitive to the fact that [a rigid] application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." In re Craftmatic, 890 F.2d at 645 (quotation and citation omitted). "Thus, courts have relaxed the rule when factual information is peculiarly within the

defendant's knowledge or control." Id. Accordingly, under the more flexible application of Rule 9(b), Plaintiffs need not allege the specific information that is exclusively within Defendants' knowledge or control. See id. at 646. However, Plaintiffs must allege facts suggesting fraudulent concealment and "why additional information lies exclusively within the defendants' control." Id.

### i.    *DP Plaintiffs' Allegations*

Defendants argue that the DP SAC fails to allege (1) an affirmative act of concealment and/or that the MgO conspiracy was self-concealing; (2) reliance; and (3) due diligence with particularity under Rule 9(b). As discussed below, however, DP Plaintiffs satisfy all three elements of the fraudulent concealment, thereby tolling the four-year statute of limitations for their antitrust claims.

### 1.    Affirmative Acts/Self-Concealment

In its prior Opinion, the Court directed Plaintiffs to allege "either (1) circumstances surrounding the MgO market during the Class Period indicating that the alleged conspiracy is self-concealing, or (2) particular circumstances surrounding Defendants' price increases and the allegedly pretextual justifications for those price increases." In re Magnesium Oxide, 2011 WL 5008090, at *22. The Court need not address whether DP Plaintiffs allege a self-concealing conspiracy because they successfully allege affirmative acts of concealment.

DP Plaintiffs' SAC alleges four specific instances where Premier provided pretextual justifications—in the form of tight supply, thinning margins, and increased energy and freight costs—for price increases in MgO in 2003, 2004, 2007, and 2008. Defendants contend that these allegations do meet Rule 9(b)'s particularity requirements because they fail to indicate (1) that Premier's justifications were "actually false or pretextual" (Def. Br. 6); (2) any particular price

12

increases by Sumitomo or YAS to establish affirmative acts by all Defendants; and (3) that any particular act of concealment took place between 2004 and 2007—the period after the statute of limitations began to run but before DP Plaintiffs discovered the Tulsa Meeting.

Defendants' contention that DP Plaintiffs' allegations fail to establish that Premier's justifications were actually false or pretextual is unavailing. Defendants cite to portions of the articles referenced in DP and IP Plaintiffs' SACs to show that Premier's statements justifying price increases were, in fact, truthful. DP Plaintiffs counter that this line of argument "impermissibly delves into a question of fact . . . that is presumed true for the purposes of" a motion to dismiss. (DP Br. 8.) Even more persuasively, DP Plaintiffs point out that whether Defendants' margins were, in fact thinning, whether their supply was, in fact, tight, and whether energy and freight costs had, in fact, increased, is beside the point. Those justifications for price increases in MgO, true or not, may nonetheless serve to mislead DP Plaintiffs as to the existence of a price-fixing and market allocation conspiracy in the domestic MgO market.

Further, DP Plaintiffs need not allege specific price increases or justifications for price increases by Sumitomo or YAS in order to establish fraudulent concealment. See Riddell v. Riddell Washington Corp., 866 F.2d 1480, 1493 (D.C. Cir. 1989) ("[A]t least where the original conspiracy contemplates concealment, or where the concealment is in furtherance of that conspiracy, affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations."); In re Elec. Carbon Prods. Antitrust Litig., 333 F. Supp. 2d 303, 316-16 (D.N.J. 2004) ("When a Clayton Act conspiracy is involved, the plaintiff must allege 'active concealment' by at least one defendant in the conspiracy, as such an act can, if the conspiracy is established, be attributed to the other members of the conspiracy."). To require a plaintiff to plead affirmative acts of concealment by

each co-conspirator would be overly burdensome, as "secrecy is [the] natural lair" of a price-fixing conspiracy.  In re Mercedez-Benz, 157 F. Supp. 2d at 372.

Finally, Defendants' contention that DP Plaintiffs must allege specific acts of concealment between 2004, the time of the Tulsa Meeting, and 2007, when DP Plaintiffs had notice of MgO conspiracy, is without merit.  There is no requirement that a plaintiff plead one or more affirmative acts of concealment that took place at a particular point in a conspiracy.[5]  DP Plaintiffs need only plead one or more affirmative acts of concealment that occurred before filing their CAC, which they have done.  Thus, DP Plaintiffs have satisfied the affirmative act element of fraudulent concealment.

    2. Reliance

In its prior opinion, the Court directed DP Plaintiffs "to adequately plead that they relied on the self-concealing nature of Defendants' conspiracy and/or pretextual justifications for Defendants' price increases."  In re Magnesium Oxide, 2011 WL 5008090, at *23.  The DP SAC alleges that "Defendants' customers, including plaintiffs and class members, were [] conditioned by experience in dealing with [D]efendants in what they believed to be a competitive industry to expect price increases from time to time," and thereby "lulled into believing that MgO price increases were the normal result of competitive market forces rather than the product of collusive and unlawful efforts."  (DP SAC ¶ 53.)  The Court need not determine whether this allegation suggests that DP Plaintiffs relied on the alleged self-concealing nature of the MgO conspiracy because it indicates that they relied on Defendants' pretextual justifications in believing that Defendants' price increase announcements were the result of market forces instead of a price-fixing and market allocation conspiracy.

---

[5] Defendants' contention appears to misinterpret the nature of the Tulsa Meeting.  That meeting was where the conspiracy was revealed, not where it was devised.

14

Defendants contend that this allegation does not satisfy the reliance element of fraudulent concealment because it fails to suggest that DP Plaintiffs were aware of Premier's justifications or that those justifications were directed at them.  This contention is unavailing because the aforementioned allegation that DP Plaintiffs' dealings with Defendants "lulled [them] into believing that MgO price increases were the normal result of competitive market forces rather than the product of collusive and unlawful efforts" (DP SAC ¶ 53), combined with the specific justification for price increases detailed by DP Plaintiffs, creates a reasonable inference that those justifications were directed toward DP Plaintiffs and that DP Plaintiffs were aware of those justifications.

Defendants further contend that DP Plaintiffs' allegations are insufficiently specific to meet the requirements of Rule 9(b) because they fail to indicate that they relied on Defendants' justifications for MgO price increases in making MgO purchases.  However, DP Plaintiffs need only plead that Defendants' justifications misled or relaxed a potential inquiry into the MgO conspiracy, see In re Lower Lake, 998 F.2d at 1179, which they have done.  Thus, DP Plaintiffs have satisfied the reliance requirement of fraudulent concealment.

      3.  Due Diligence

In its prior opinion, the Court directed DP Plaintiffs "to adequately plead, in accordance with Rule 9(b), (1) when and how they discovered the alleged MgO conspiracy, and (2) that the self-concealing nature of the conspiracy and/or pretextual justifications for Defendants' price increases made it so that they were not alerted to any storm warnings that would otherwise trigger an obligation to perform due diligence." In re Magnesium Oxide, 2011 WL 5008090, at *23.  The DP SAC alleges that DP Plaintiffs began investigating "[D]efendants' conduct . . . and the MgO industry . . . after a witness (who was not a purchaser of MgO) informed attorneys of

15

the details" of the Tulsa Meeting shortly after it transpired. (DP SAC ¶ 54.) DP Plaintiffs' counsel informed DP Plaintiffs of the meeting "in late 2007," and "[a] diligent investigation ultimately led to the commencement of the actions in 2010." (DP SAC ¶ 49.) Before that time, according to DP Plaintiffs, "[t]here were no events during the Class Period sufficient to put either plaintiffs or class members on inquiry notice to diligently investigate a potential antitrust claim." (DP SAC ¶ 54.)

Defendants argue that these allegations are insufficient because they fail to allege (1) when DP Plaintiffs' counsel "learned of the conspiracy or when and how the anonymous source discovered it" (DP Pl. Br. 12); and (2) why DP Plaintiffs could not have learned of the MgO conspiracy before late 2007 by talking to the whistleblower, who informed DP Plaintiffs' of the Tulsa Meeting, or the Vannorsdels, non-participants in the MgO conspiracy who attended the Tulsa Meeting.

At oral argument, DP Plaintiffs' counsel divulged that the whistleblower provided information regarding the MgO conspiracy very shortly after the Tulsa Meeting, which occurred in the summer of 2004. DP Plaintiffs' counsel further represented that, from that point on, it conducted a diligent investigation, which led to DP Plaintiffs' learning of the MgO conspiracy in 2007. This apparently led to further investigation, which ultimately resulted in filing the initial Complaint in 2010.

Defendants contend that it is curious that, for six years, DP Plaintiffs' counsel was on inquiry notice of a cause of action with a four-year statute of limitations. However, at this stage of litigation, the Court may not assess the merits of DP Plaintiffs' counsel's allegations that (1) it conducted its investigation leading up to the filing of the initial Complaint diligently and in good

faith and (2) DP Plaintiffs were not on inquiry notice of their cause of action before late 2007.[6] Furthermore, DP Plaintiffs need not allege why they could not have learned of the MgO conspiracy from parties who knew of it before DP Plaintiffs. The DP SAC does not suggest that DP Plaintiffs had any contact with the whistleblower or the Vannorsdels. Thus, DP Plaintiffs have satisfied the due diligence prong of fraudulent concealment.

### ii. IP Plaintiffs' Allegations

Defendants set forth several arguments that the IP SAC fails to satisfy the elements of fraudulent concealment. In this instance, Defendants are correct, and the Court need only address one of those arguments: that IP Plaintiffs fail to allege that Defendants' pretextual justifications for MgO price increases, or the self-concealing nature of the MgO conspiracy, relaxed or mislead IP Plaintiffs' potential inquiry into the MgO conspiracy. The IP SAC provides no indication that IP Plaintiffs were aware of the pretextual justifications around the time that Defendants increased their MgO prices (or even before filing their initial complaint), or that they were even aware of Defendants' MgO price increases in the first place. Indeed, IP Plaintiffs admit that "they are farmers who purchase their feed rations and fertilizers [containing MgO sold by Defendants] at their local mills." (IP Pl. Br. 18.) Thus, IP Plaintiffs could not plausibly have been misled by Defendants' justifications or any self-concealing aspect of the MgO conspiracy. Accordingly, IP Plaintiffs' claims are time-barred under their respective statutes of limitations.

## C. IP Plaintiffs' Antitrust Standing

---

[6] There is no indication of an attorney-client relationship before that time. Thus, any knowledge of the MgO conspiracy on the part of DP Plaintiffs' counsel cannot be imputed to DP Plaintiffs.

Defendants also correctly argue that IP Plaintiffs lack Article III standing to pursue their antitrust claims because they fail to show that the MgO conspiracy would have more than a minimal foreseeable effect on the price of products containing MgO that they purchased. In its prior opinion, the Court directed IP Plaintiffs "to allege (1) the specific purchased products containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged" MgO conspiracy. In re Magnesium Oxide, 2011 WL 5008090, at *7.

The IP SAC alleges that IP Plaintiffs purchased cattle feed rations and mineral packs containing up to 4% CCM. This percentage of MgO is too small to provide a sufficient nexus between IP Plaintiffs' MgO products and the MgO conspiracy. See Shield of Virginia v. McCready, 457 U.S. 465, 479 (1982) (indirect purchaser standing exists where "the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause."); In re Warfarin Sodium Antitrust Litig., 214 F.3d, 395, 400 (3d Cir. 2000) (allegations suggesting that a plaintiff's injury is "inextricably intertwined with the injury that the conspirators sought to inflict" provides a indirect purchaser standing). While a small percentage of a price-fixed ingredient in a product may not be fatal to a product purchaser's standing to bring antitrust claims, there must be a showing that a price increase in that ingredient has a significant foreseeable effect on the price of the purchased product. See, e.g., In re Warfarin, 214 F.3d at 400-01 (purchasers of prescription drug whose active ingredient was the subject of a price-fixing conspiracy maintained standing to sue as indirect purchasers).

IP Plaintiffs further allege that they purchased particular types of cattle feed and mineral packs for the specific quantities of CCM contained therein. This allegation fails to suggest that an increase in the price of Defendants' CCM would have a significant foreseeable effect on the

price of the cattle feed rations and mineral packs that they purchased.  Consequently, IP Plaintiffs lack standing to pursue their antitrust claims.

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED with respect to the IP SAC and DENIED with respect to the DP SAC.  The IP SAC is dismissed in its entirely with prejudice.

The Court will enter an order implementing this opinion.

   /s/Dickinson R. Debevoise_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: April 5, 2012